1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   United States of America,                    No. 2:20-cr-00001-KJM-1

12                    Plaintiff,                   ORDER

13          v.

14   Julius Rucks,

15                    Defendant.

16

17          Defendant Julius Rucks moves to suppress evidence the United States obtained in a search

18   of his apartment following his arrest.  Mr. Rucks and the United States disagree about whether he

19   was arrested inside or outside of his residence, and so the court held an evidentiary hearing on

20   that narrow issue.  The court now finds the United States has not met its burden to show

21   Mr. Rucks was arrested inside his apartment.  The initial protective sweep of his apartment thus

22   was an unreasonable search in violation of his Fourth Amendment rights.  Because the

23   subsequent search warrant was based on information obtained through the unlawful protective

24   sweep, the evidence obtained during the subsequent search must be suppressed.  **The court**

25   **grants Mr. Rucks's motion to suppress.**

26   **I.     BACKGROUND**

27          Although the parties dispute Mr. Rucks's arrest location, they agree on some preliminary

28   facts leading to the arrest.  The following background is not disputed.

                                         1

In July 2019, then-Detective James Beller of the Butte County Sheriff's Office and Senior Special Agent Jim Holcomb of the United States Secret Service obtained a *Ramey* arrest warrant[1] for Julius Rucks.  Narrative at 4, Mot., ECF No. 56-1.[2]  The warrant was based on surveillance of Mr. Rucks selling counterfeit U.S. currency.  *Id.*  A few days later, on July 23, Beller and Holcomb, along with other detectives and special agents, served the warrant.  *Id.*

Detectives Beller and Jason Miller of the Butte County Sheriff's Office knocked on Mr. Rucks's door and announced themselves as Sheriff's deputies.  *Id.*  Mr. Rucks asked who was outside.  *Id.*  They told him to open the door, and so he did, although the door only opened partway due to a chain lock.  *Id.*  Detective Miller identified the occupant as Mr. Rucks and ordered him to fully open the door.  *Id.*  Mr. Rucks shut the door and re-opened it approximately 10 seconds later.  *Id.*  What happened next is contested.

Mr. Rucks claims he stepped outside the apartment, closed the door behind him, was arrested outside, and then the officers conducted a protective sweep of the apartment.  *See* Mot. at 3, ECF No. 56.  In contrast, the United States contends Mr. Rucks stepped backward after opening the door, was arrested inside the apartment, and then the officers conducted a protective sweep.  *See* Opp'n at 2, ECF No. 57.

During the protective sweep, the detectives saw ammunition and a piece of equipment – later identified as a pill press – in plain view, which formed the basis of a search warrant application.  Narrative at 5; Search Warrant Aff. at 17, Mot., ECF No. 56-1.  A state court judge signed the search warrant, and Beller served it.  Narrative at 6; Search Warrant at 13.  The subsequent search, executed by Beller and Drug Enforcement Administration (DEA) agents, revealed more contraband.  Narrative at 6; DEA Rep. at 3, Opp'n, ECF No. 57-5.

---

[1] "Before the filing of criminal charges, the court may authorize a residential arrest by issuing a so-called *Ramey* warrant[.]"  *Goodwin v. Super. Ct.*, 90 Cal. App. 4th 215, 218 (Cal. Ct. App. 2001) (citation omitted); *see also People v. Ramey*, 16 Cal. 3d 263, 275 (1976) ("[I]n the absence of a bona fide emergency, or consent to enter, police action in seizing the individual in the home must be preceded by the judicial authorization of an arrest warrant.").

[2] Pages cited in this document are those applied by the CM/ECF system.

1       Prior to his arrest, Mr. Rucks had been the subject of two separate investigations. As

2 indicated above, Secret Service agents had been investigating Mr. Rucks for counterfeit U.S.

3 currency transactions. Search Warrant Aff. at 16. Unknown to the Secret Service, the DEA had

4 been investigating Mr. Rucks simultaneously for distributing thousands of fentanyl pills. *Id.* at

5 17. The DEA learned about the arrest and protective sweep on July 23 when the Butte County

6 Sheriff's Office contacted DEA agents to report the fentanyl pill press and request "their

7 assistance." Narrative at 5. After contacting the DEA, the Butte County detectives applied for

8 the search warrant, *see* Search Warrant Aff. at 17, and then DEA agents participated in the

9 subsequent search, so they could process the pill press and associated fentanyl paraphernalia,

10 Narrative at 6; *see generally* DEA Rep.

11       Mr. Rucks is charged in this case with being an ex-felon in possession of firearms in

12 violation of 18 U.S.C. § 922(g)(1), fentanyl distribution in violation of 21 U.S.C. § 841(a)(1), and

13 possession with intent to distribute fentanyl. Compl. at 1, ECF No. 1; Superseding Indictment at

14 2–4, ECF No. 28; Mot. at 2. These charges are based in part on items found in a search of

15 Mr. Rucks's apartment. Mot. at 2; Felony Rep. at 3, Mot., ECF No. 56-1; DEA Receipt at 23,

16 Mot., ECF No. 56-1.

17       As noted, Mr. Rucks moves to suppress all evidence obtained during the search, arguing

18 the officers violated his Fourth Amendment rights. Mot. at 2–3. He claims he was arrested

19 outside his apartment, his door was closed, and the officers conducted an unconstitutional search

20 by entering his apartment. *Id.* The United States opposes the motion. Opp'n. It argues

21 Mr. Rucks's motion is meritless in part because he was arrested inside the apartment and therefore

22 the search was a valid protective sweep. *Id.* at 4–7. The location of the arrest determines which

23 standard applies to assess whether the protective sweep was constitutional. *See Maryland v. Buie*,

24 494 U.S. 325, 334 (1990); Mot. at 7–8. Therefore, Mr. Rucks requested an evidentiary hearing on

25 the disputed arrest location. Reply, ECF No. 58.

26       The court held an evidentiary hearing on September 12, 2022, allowing the parties to elicit

27 evidence regarding whether Mr. Rucks was arrested inside or outside his apartment. *See*

28 *generally* Hr'g Mins., ECF No. 79. Cameron Desmond represented the United States; Tamara

1  Soloman appeared for Mr. Rucks.  Mr. Rucks was present and testified.  The court first explains

2  and makes its factual findings based on the evidentiary hearing.

3  **II.    EVIDENTIARY HEARING**

4        The court held a narrow evidentiary hearing to determine whether Mr. Rucks was arrested

5  inside or outside his apartment.  It is the government's burden to show by a preponderance of the

6  evidence that Mr. Rucks was arrested inside his home, if it is to prevail.  *See United States v.*

7  *Matlock*, 415 U.S. 164, 177 n.14 (1974) (citing *Lego v. Twomey*, 404 U.S. 477 (1972)).  At the

8  conclusion of the hearing, the parties made closing arguments and then the court took the motion

9  under submission.

10       Resolving the question before the court requires making an extremely close call.  On the

11  one hand, the government tells a facially credible story, supported by evidence.  At the same time

12  there are some gaps in its narrative.  On the other hand, Mr. Rucks also tells a facially credible

13  story, supported by evidence, with gaps as well.  As explained below, the court ultimately finds

14  the two versions of the arrest equally credible, meaning the evidence is in equipoise and the

15  government has not met its burden.  *Cf. Simmons v. Blodgett*, 110 F.3d 39, 42 (9th Cir. 1997)

16  ("Well-settled principles guide the fact-finding process, including the rule that when the scales

17  are evenly balanced and the relevant evidence leaves a trier of fact in 'equipoise,' the party with

18  the burden of proof loses."); *Medina v. California*, 505 U.S. 437, 449 (1992).

19       **A.    The United States' Narrative**

20       The United States claims Mr. Rucks was arrested inside his apartment.  Opp'n at 2.

21  Evidence in the record supports this claim.

22       First, the government's witnesses told a consistent story.  Each testified Mr. Rucks was

23  arrested inside his apartment.  Detective Miller testified that, after Mr. Rucks opened the door the

24  second time, "Detective Beller stepped in and grabbed him and moved him into the living room

25  area so we could go past him to clear the residence."  Hr'g Tr. at 14:1–3, ECF No. 81.[3]  Miller

26  testified more pointedly that Mr. Rucks could not have stepped outside because "Sergeant Beller

---

[3] Transcript pages and line numbers refer to those on the transcript, not those applied by the CM/ECF system.

went in and grabbed him" as soon as Mr. Rucks opened the door.  *Id.* at 9:8–9.  Sergeant Beller

confirmed he "went right in and took him into custody," denying that Mr. Rucks was allowed to

take a step forward to go outside.  *Id.* at 23:18, 23:23–4.  Sergeant Tiffany Larson of the Butte

County Sheriff's Office testified she does not "remember [Mr. Rucks] coming out the door prior

to us entering."  *Id.* at 37:8–9.

   Second, the police report and officers' declarations tell a similar story.  Beller and Miller's

declarations aver the officers pushed "into the apartment as the defendant stepped backward

farther into the apartment."  Beller Decl. ¶ 4, Opp'n, ECF No. 57-1; *see* Miller Decl. ¶ 3, Opp'n,

ECF No. 57-2.  Beller included nearly identical language in his police report.  *See* Narrative at 4

(". . . Rucks opened the door and stepped backward farther into the apartment.  At that time, I

placed Rucks in handcuffs.").  The only contemporaneous evidence, namely Beller's police

report, therefore supports the government's story.

   Third, a few undisputed details suggest Mr. Rucks might not have chosen to exit his

apartment before the arrest.  The officers were executing an arrest warrant, and announced as

much; Mr. Rucks would have understood they were there to gain control of him immediately.

Hr'g Tr. at 28:16 (Beller's goal was to "keep [his] hands on [Mr. Rucks]").  When Mr. Rucks

opened the door, he testified, he "saw a bunch of guns."  *Id.* at 45:6–7.  A person confronted by

officers with guns might well hesitate to step toward them, especially onto a relatively narrow,

"three-foot walkway" outside an apartment.  *Id.* at 21:22.  These considerations lend weight to the

government's position that Mr. Rucks opened the door and stepped backward while all three

officers rushed into the apartment.

   At the same time, the court notes that Secret Service agents were at Mr. Rucks's

apartment when he was arrested; they did not testify to confirm local law enforcement's

explanations of what happened.  *See id.* at 6:20–23, 12:5–8; *cf. United States v. Tory*, 52 F.3d

207, 211 (9th Cir. 1995) (" . . . [T]he government's failure to produce relevant evidence within its

control [can] give[] rise to an inference that the evidence would be unfavorable to it."); *United

States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012) (explaining the "two requirements

for a missing-witness instruction").  Documentation of the actual scene of the arrest was sparse: a

single photograph of Mr. Rucks's front door ajar, taken at an unspecified time. *Id.* at 8:14–18; Gov't Ex. B. There are no videos, body camera images or other pictures of the arrest or the moments before or after. Although the Sheriff's department had not issued body cameras to the investigations unit at that time, *see* Hr'g Tr. at 18:13–24, photography presumably was available as a tool.

Second, some inconsistencies in the officers' testimony suggest their memories about the minutiae of the arrest, occurring more than three years prior to the hearing, were imperfect. Miller testified Beller knocked on the door, *see id.* at 6:25, but Beller said Miller knocked, *see id.* at 22:12, 26:22. Additionally, Beller wrote in his police report that Miller told him about the ammunition immediately after the protective sweep, and he wrote that Miller told him about the pill press by phone when Beller was back at the office working on the warrant application. Narrative at 5. However, Miller testified he told Beller about the pill press while Beller was still at the apartment. Hr'g Tr. at 18:7–8. If Miller told Beller about seeing ammunition immediately and did not tell him about the pill press until Beller was back at the office, then that delay might support an inference that Miller did not see the pill press during the protective sweep. Such an inference might also be supported by Sergeant Larson's testimony, given that he did not appear to know what the pill press was initially. *See id.* at 38:19–21 ("During the protective sweep, I made entry into the second room and stepped over what we learned to be a pill press . . . ."). Without making credibility determinations about the officers' testimony, the court notes these factual discrepancies are unexplained by the totality of the record.

Third, as noted above, the DEA had been investigating Mr. Rucks for distributing thousands of fentanyl pills. *See id.* at 68:19–69:3; Search Warrant Aff. at 17. In contrast, the Secret Service investigation concerned just two counterfeit U.S. currency transactions, *see* Narrative at 4, and nothing in the record suggests law enforcement's suspicion that firearms or other weapons were being used in the conduct of those transactions. The government called DEA Special Agent Brian Nehring to make the point the DEA had not known about the Secret Service investigation, nor about the plan to apply for an arrest warrant until the Butte County detectives contacted him to inform the DEA they had found a fentanyl pill press on July 23. Hr'g Tr. at

6

1   69:20, 70:5–19.  Agent Nehring was frustrated upon learning of the Butte County arrest warrant,

2   because it got ahead of his plan to seek a search and arrest warrant in due time.  *Id.* at 69:10–17.

3   Any problems with the Butte County arrest could jeopardize the DEA investigation; by the time

4   he was finalizing his search warrant application, Beller knew about the DEA investigation.  *See*

5   Search Warrant Aff. at 17.  Without making credibility determinations here either, the court notes

6   the context in which the search warrant was obtained and executed.

7        If the record as reviewed above were all the court had to review, it would find the

8   government had met its burden, at least minimally.  But the court also must take account of the

9   record created by Mr. Rucks.

10       **B.    Mr. Rucks's Narrative**

11       Mr. Rucks claims he was arrested outside his apartment.  Mot. at 3.  The record provides

12  support for his position as well.

13       First, Mr. Rucks's own testimony explaining he was arrested outside the front door of his

14  apartment was consistent; his demeanor was calm and forthright.  He remembered more details

15  than the detectives, such as what the officers said when they knocked and announced, *see* Hr'g

16  Tr. at 45:3–4, admitting no discrepancies despite rigorous cross-examination*, see, e.g.*, *id.* at

17  61:4–62:5.  He explained why the government's position that he had to have stepped backward to

18  open his front door was erroneous: he was adamant he was able to open the door just the width of

19  his body and step out by standing to the side, which he would know because it is his door.  *See id.*

20  at 61:17–22.  He repeatedly responded he "did not know" if he could not remember answers to

21  certain questions.  For example, he did not recall exactly how long it took him to grab his

22  belongings, *see id.* at 46:21–24, and whether he locked the door behind him as he exited, *see id.* at

23  48:23–49:1.

24       Second, Mr. Rucks's testimony regarding his reactions to his circumstances at the time of

25  the arrest provides a coherent description.  As noted, he testified he initially opened the door

26  partway, saw officers outside with "a bunch of guns," and then promptly closed the door.  Hr'g

27  Tr. at 45:6–20.  He had heard the order to "come outside," so he put on his shoes, grabbed his

28  keys and wallet, and headed to the door.  *Id.* at 46:3–16.  This testimony is not inconsistent with

1    Beller's testimony that Mr. Rucks took "10 seconds" between closing and then re-opening the

2    door.  *Id.* at 23:10.  Before Mr. Rucks went outside, he said he intended to lock the door to

3    prevent the officers from entering, because he believed they needed "a search warrant to go inside

4    any lockboxes, locked doors, locked rooms."  *Id.* at 48:21–49:7.  He admitted he does not recall

5    whether he actually locked the door.  *Id.* at 48:25.  He was adamant, however, that he never

6    stepped backward into the apartment and was rather arrested outside.  *Id.* at 52:24, 53:3–4.

7    Mr. Rucks's explanation itself, that by his actions he was seeking to block a search of his

8    apartment, is not self-serving and suggests he was telling the truth even if unfavorable.  Having so

9    testified, he knowingly submitted to cross-examination, even if his testimony is not available for

10   the purpose of attempting to prove his guilt at trial.  *Id.* at 60:18–62:5, 62:22–64:12; *United States*

11   *v. Salvucci*, 448 U.S. 83, 88 (1980) ("[T]estimony given by a defendant in support of a motion to

12   suppress cannot be admitted as evidence of his guilt at trial.").  His testimony that he quickly

13   decided to put on his shoes and grab his wallet and keys was unrebutted and supports the idea he

14   was preparing to walk outside.  *Id.* at 45:21–46:24.

15        Third, Mr. Rucks's position regarding the location of his arrest is tied to the events of that

16   day and does not appear to be a post hoc invention to escape prosecution.  When the government

17   pressed Mr. Rucks on why he chose to testify, he said he took the stand because "they lied on

18   their police report," *id.* at 66:2, and "they broke the law or violated [his] rights," *id.* at 65:19–20.

19   When the government asked Mr. Rucks how his testimony would result in suppressing evidence,

20   he responded that he is not an attorney, prosecutor, or judge and does not know how the parties'

21   factual dispute translates into the law.  *Id.* at 66:8–10.

22        While the record contains some evidence that could lead the court to question Mr. Rucks's

23   version of the relevant events, the evidence is not strong and ultimately is not fatal to Mr. Rucks's

24   position.  While he previously has been convicted of at least one felony, *id.* at 57:10–18, at

25   hearing the government did not introduce details about that prior conviction offense or

26   Mr. Rucks's criminal history otherwise.  Additionally, Mr. Rucks's concession at hearing that he

27   is motivated to testify in a way to help his case is a factor the court considers, but his freely

1    acknowledging as much without evasiveness or signs of defensiveness is offsetting.  *See id.* at

2    65:22.

3         In sum, Mr. Rucks's narrative is plausible in a way that focuses the dispute for the court to

4    resolve.

5         **C.      Factual Findings**

6         Having carefully considered the totality of the record before it, the court finds that neither

7    the government nor Mr. Rucks showed its version of the story more probably than not matches

8    what occurred at the time of Mr. Rucks's arrest.  Each side relied on its own witnesses' version of

9    events and lacked third party corroboration.  The government put forward the testimony of three

10   county detectives.  The government argued in closing it met its burden because of "the

11   consistency of the officers[']" testimony.  Hr'g Tr. at 75:21–22.  But as reviewed above, the court

12   finds the detectives' testimony does not cancel out Mr. Rucks's own consistent testimony.  *Cf.*

13   *Raybon v. Hardy*, No. 12-1008, 2016 WL 915824, at *7 (E.D. Cal. Mar. 10, 2016) ("The weight

14   of the evidence as to a fact does not necessarily depend on the number of witnesses who testify

15   about it.").  If fact finding were merely a numbers game, then the government could always meet

16   its burden by offering as witnesses more arresting officers than suspects.

17        The governments' supporting documents do not tip the scale either.  While generally

18   consistent with the officers' testimony, they also do not fatally undermine Mr. Rucks's version of

19   events.

20        Both sides appealed to common sense.  In closing, the government argued there was no

21   space on the walkway for Mr. Rucks to step outside, and in any event the officers would not have

22   allowed him to step toward them due to officer safety concerns.  Hr'g Tr. at 74:16–75:6.  It

23   claimed Mr. Rucks could not have opened the door without stepping backward.  *Id.* at 74:19–20

24   ("When a door opens inward, you have to step backwards to open that door.").  But, as Mr. Rucks

25   testified, he opened the door "as wide as [his] body[,]" *id.* at 47:4, and standing to "the left of the

26   door . . . [could] just walk right out[,]" *id.* at 61:19–21.  The government's hand-drawn diagram

27   of Mr. Rucks's apartment does not suggest it is impossible or even unlikely that Mr. Rucks stood

28   as he said he did, *see* Ex. D at 2, Opp'n, ECF No. 57-4, nor does the sole photograph admitted

1   into evidence at the hearing, *see* Gov't Ex. B.  Mr. Rucks contends common sense dictated the

2   officers "would ask him to come outside and arrest him outside where there were multiple law

3   enforcement [sic] ready to take action, not go inside where . . . there could have been some

4   hidden danger."  *Id.* at 78:19–23.  Moreover, Mr. Rucks's explanation of his strong motive to lock

5   the door to his apartment behind him was consistent and not unbelievable.  *See id.* at 46:3–5,

6   48:24–49:7.  In sum, neither party's narrative clearly outweighs the other.  No witness is

7   obviously untrustworthy, and neither side's evidence disproves the other side's evidence.

8        Faced with two plausible stories, the court has considered whether the truth lies

9   somewhere in between.  The government says Mr. Rucks opened the door partway, closed it for

10   approximately ten seconds, re-opened the door, stepped backward into the apartment, and the

11   police rushed in.  In contrast, Mr. Rucks claims he opened the door partway, closed it for a brief

12   moment while he retrieved his shoes, keys and wallet, then stood to the side of the door, re-

13   opened it only as wide as his body, stepped outside, and closed the door behind him.  Perhaps,

14   then, once he was ready, Mr. Rucks did try to slip out the door and close it behind him, and

15   simultaneously, the police rushed in to arrest him.  In that scenario, Mr. Rucks would have been

16   arrested in the doorway itself, neither outside nor inside.  The excitement of the situation,

17   combined with the officers' and Mr. Rucks's differing perspectives, might explain the opposing

18   stories.  But a single phrase in one witness's testimony is the only evidence supporting this

19   version.  Although Sergeant Miller testified "Sergeant Beller then went in and grabbed him *in the*

20   *door*" and "pushed into the living room with Mr. Rucks," which implies an arrest in the doorway,

21   this solitary statement does not otherwise tip the scales one direction or the other.  Hr'g Tr. at

22   7:21–8:1 (emphasis added).  Moreover, Sergeant Miller clarified on cross-examination, he meant

23   to say:  "Detective Beller stepped in and grabbed him and moved him into the living room area so

24   we could go past him to clear the residence."  *Id.* at 14:1–3.  The record does not support finding

25   an arrest in the doorway.

26        The court thus concludes this case presents the "rare[]" situation in which the evidence is

27   in equipoise, with the allocation of the appropriate burden determining the result.  *Goldman Sachs*

28   *Grp., Inc. v. Arkansas Teacher Retirement Sys.*, 141 S. Ct. 1951, 1963 (2021) (explaining district

1   court's "task" is to review all evidence and determine "whether [one narrative] is more likely than

2   not"; allocation of burden only has "bite . . . when the court finds the evidence in equipoise").

3   Here, the government had the burden to show it was more likely than not Mr. Rucks was arrested

4   inside his apartment.  *See Matlock*, 415 U.S. at 177 n.14.  It has not met that burden.  For

5   purposes of resolving the motion to suppress then, the court assumes Mr. Rucks was arrested

6   outside his home.

7   **III.   LEGAL STANDARD FOR SUPPRESSION**

8          "The exclusionary rule was adopted to effectuate the Fourth Amendment right of all

9   citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches

10  and seizures . . . .'"  *United States v. Calandra*, 414 U.S. 338, 347 (1974) (quoting U.S. Const.

11  amend. IV).  The Fourth Amendment applies to the states through the Fourteenth Amendment.

12  *Mapp v. Ohio*, 367 U.S. 643, 650, 657–58 (1961).

13         Under the exclusionary rule, a criminal defendant may move to suppress evidence

14  obtained in violation of the Fourth Amendment.  *See Calandra*, 414 U.S. at 341, 347; Fed. R.

15  Crim. P. 41(h).  This prohibition applies "both to direct products of an illegal search—i.e., the

16  physical evidence found during the search itself—and to indirect products of the illegal search—

17  i.e., statements or physical evidence subsequently obtained in part as a result of the search—if

18  they bear a sufficiently close relationship to the underlying illegality."  *United States v. Shetler*,

19  665 F.3d 1150, 1157 (9th Cir. 2011) (citation and internal quotation marks omitted).  Not every

20  Fourth Amendment violation requires the remedy of suppression.  *See Davis v. United States*,

21  564 U.S. 229, 232, 242–44 (2011).  When deciding a motion to suppress, courts first determine

22  whether a Fourth Amendment violation occurred, and then consider whether suppression is

23  appropriate.  *Id.*

24         A warrantless search is "*per se* unreasonable under the Fourth Amendment—subject only

25  to a few specifically established and well-delineated exceptions."  *United States v. Scott*, 705 F.3d

26  410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "[T]he

27  government bears the burden of showing that a warrantless search or seizure falls within an

28  exception to the Fourth Amendment's warrant requirement."  *United States v. Cervantes*,

1   703 F.3d 1135, 1141 (9th Cir. 2012) (citation omitted); *see also Matlock*, 415 U.S. at 177 n.14

2   (noting "controlling burden of proof at suppression hearings should impose no greater burden

3   than proof by a preponderance of the evidence") (citation omitted).  "When the government fails

4   to carry its burden, all fruits of the Fourth Amendment violation must be suppressed." *United*

5   *States v. Cole*, 445 F. Supp. 3d 484, 488 (N.D. Cal. 2020) (citing *Cervantes*, 703 F.3d at 1142 n.1,

6   1143).  **IV. MOTION TO SUPPRESS ANALYZED**

7        When a defendant moves to suppress, as in this case, the government bears the burden of

8   proving by a preponderance of the evidence that a warrantless search or seizure falls within one

9   of the delineated exceptions to the warrant requirement.  *See United States v. Huguez-Ibarra*, 954

10  F.2d 546, 551 (9th Cir. 1992).  Here, there were two searches: the initial warrantless sweep of the

11  apartment and the search following execution of the search warrant.  The government argues the

12  first search falls under the protective sweep exception, and the second search was either executed

13  under a valid warrant or falls under the inevitable discovery exception or the good-faith

14  exception.  *See* Opp'n at 2–3; Hr'g Tr. at 75:21–76:14.  The court takes these arguments in turn.

15       **A.      Protective Sweep**

16       A protective sweep of a residence is an exception to the warrant requirement.  When the

17  sweep is incident to an arrest, officers can, "as a precautionary matter and without probable cause

18  or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest

19  from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.  To search beyond

20  that "immediate space," "there must be articulable facts which, taken together with the rational

21  inferences from those facts, would warrant a reasonably prudent officer in believing that the area

22  to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

23       Following *Buie*, the Ninth Circuit held that officers may constitutionally conduct a

24  "protective sweep of the interior of a house when the defendant had been arrested just outside the

25  door to the house." *United States v. Paopao*, 469 F.3d 760, 765 (9th Cir. 2006); *see United States*

26  *v. Hoyos*, 892 F.2d 1387, 1398 (9th Cir. 1989), *overruled on other grounds*, *United States v. Ruiz*,

27  257 F.3d 1030, 1032 (9th Cir. 2001) (en banc).  The Circuit cabined acceptable interior protective

28  sweeps following outside arrests to *Buie*'s beyond-the-immediate-space category and thus

1    required reasonable suspicion.  Specifically, "[w]hen officers lawfully arrest a person outside his

2    home, they may search the interior of the home so long as they have a 'reasonable suspicion of

3    danger.'" *United States v. Mackey*, 431 F. App'x 594, 595 (9th Cir. 2011) (unpublished) (quoting

4    *Paopao*, 469 F.3d at 766) (upholding finding of reasonable suspicion in part because officers

5    stood on porch next to two large windows and were vulnerable to attack from within home).

6         Here, the court assumes Mr. Rucks was arrested outside his home and the officers then

7    conducted a protective sweep.  Anticipating this possible scenario, the government argues the

8    officers reasonably believed someone else was in the apartment and posed a danger to them.

9    Opp'n at 7.  The government draws that conclusion from Mr. Rucks's nervous and sweaty

10   appearance, his suspicious refusal to immediately open the door all the way, and his delay after

11   closing the door before opening it again.  *Id.*; Beller Decl. ¶ 4 ("Rucks appeared very nervous and

12   was sweating profusely when he first opened the door . . . ."); Hr'g Tr. at 7:7–11 (Miller

13   describing his concern about Mr. Rucks's opening and closing of the door); Miller Decl. ¶ 4

14   (same); Hr'g Tr. at 23:13–16 (Beller describing similar concerns).  But these facts are insufficient

15   to support a finding of reasonable suspicion.  The officers had surveilled the apartment that

16   morning and seen no signs of another person.  Hr'g Tr. at 10:6–11:9, 25:9–25.  They had not

17   sought information, like a lease agreement, to determine if a second person lived at the apartment.

18   *Id.* at 11:10–16.  Nothing in the record indicates they had seen something through the windows

19   while outside his apartment.  The arrest warrant was based on Mr. Rucks's alleged selling

20   counterfeit U.S. currency with no suggestion he posed any risk of violence or possessed firearms.

21   *See* Search Warrant Aff. at 17 ("[Beller] authored a 'Ramey' arrest warrant for Julius Rucks

22   regarding his felony violation of 475(a) PC.").  While the government suggests it could present

23   additional evidence at a further hearing, it has not proffered what that might be.

24        This case thus differs from *United States v. Alatorre*, which the government cites.  Opp'n

25   at 7 (citing 863 F.3d 810, 814–15 (8th Cir. 2017)).  In *Alatorre*, (1) a third person was in the

26   residence until called to the door, (2) the arrest concerned an alleged violent attack, leading the

27   officers to be concerned about concealed weapons in the house that could be used for an ambush,

1    and (3) the sounds heard from outside of multiple people "created a reasonable uncertainty as to

2    how many people were inside the residence." *Alatorre*, 863 F.3d at 814–15.

3           Moreover, the cases cited in *Alatorre* involve more indicators of danger than what the

4    officers confronted at Mr. Rucks's front door. *See, e.g.*, *United States v. Davis*, 471 F.3d 938,

5    945 (8th Cir. 2006) (citing multiple cars and trailer parked on property and intelligence that other

6    persons came to property to manufacture methamphetamine).  The court is aware of no other case

7    in which a protective sweep of a residence was found to be constitutional when the defendant was

8    arrested outside and the sole facts supporting a protective search consisted of defendant's

9    demeanor and rate of perspiration.  Indeed, if officers could always perform a protective sweep of

10   a home when arresting a nervous suspect outside, then the reasonable-suspicion standard would

11   appear to mean very little.

12          Because the government has not put forward articulable facts to support the officers'

13   perceiving a reasonable suspicion of danger from inside the apartment, the protective sweep was

14   an unreasonable search.  No other warrant exception applies to the sweep.  This search was

15   therefore unconstitutional.

16          **B.      The Search Warrant**

17          "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct

18   result of an illegal search or seizure and, relevant here, evidence later discovered and found to be

19   derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232,

20   237 (2016) (quotation marks and citation omitted).  A search warrant is the derivative of an illegal

21   search when "the agents' decision to seek the warrant was prompted by what they had seen

22   during the initial entry[.]" *Murray v. United States*, 487 U.S. 533, 542 (1988).  "The exclusionary

23   rule requires a causal connection between the illegal conduct and the evidence sought to be

24   suppressed." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004).  In other words,

25   "[w]hat counts is whether the actual illegal search had any effect in producing the warrant[.]"

26   *Murray*, 487 U.S. at 542 n.3.

27          Due to "the significant costs" of suppression, there are three exceptions that test whether

28   the unconstitutional search helped produce the warrant. *Strieff*, 579 U.S. at 237.  First, the

14

1   independent source doctrine allows admission of illegal evidence if it was independently acquired

2   from a source separate from an impermissible search.  *Murray*, 487 U.S. at 537.  Second, the

3   inevitable discovery doctrine allows admission of illegal evidence if it would have been

4   discovered notwithstanding the constitutional violation.  *Nix v. Williams*, 467 U.S. 431, 442–44

5   (1983).  Third, evidence is admissible under the attenuation doctrine if "the connection between

6   unconstitutional police conduct and the evidence is remote or has been interrupted by some

7   intervening circumstance[.]"  *Strieff*, 579 U.S. at 238.  Even if the search warrant is invalid, the

8   fruit of the subsequent search could nevertheless be admitted so long as the officers objectively

9   relied on the warrant in good faith.  *United States v. Leon*, 468 U.S. 897, 922–24 (1984).

10          Here, the threshold question is whether the search warrant itself is fruit of the poisonous

11   tree, i.e., whether it is tainted by the illegal initial search.  After the protective sweep, Beller

12   returned to the office with Mr. Rucks in custody and obtained a search warrant.  Narrative at 6.

13   The probable cause statement for the search warrant relied on finding "ammunition boxes" and "a

14   pill press . . . with a container of a white power substance" during the protective sweep.  Search

15   Warrant Aff. at 17.  It also noted Mr. Rucks's admission that the substance used for the pill press

16   was heroin.  *Id.*  Beller's declaration expressly states the information found during the protective

17   sweep "formed the basis of the search warrant."  Beller Decl. ¶ 8; *see also* Search Warrant Aff. at

18   17.  No evidence in the record indicates that, absent the illegal protective sweep, the Butte County

19   detectives and Secret Service agents would have sought a search warrant for Mr. Rucks's

20   apartment.  As a result, the search warrant is fruit of the poisonous tree, unless an exception

21   applies.

22          The government argues two of the exceptions identified above apply: the inevitable

23   discovery doctrine and good-faith exception.  First, the government claims the seized evidence

24   would inevitably have been discovered.  Opp'n at 8–9.  Second, the government contends the

25   officers executed the search warrant in good faith reliance on an objectively reasonable warrant.

26   *Id.* at 9–10.  Mr. Rucks has not responded to these arguments.  The court begins with the

27   inevitable discovery doctrine.

1           **1.      Inevitable Discovery**

2           "If the prosecution can establish by a preponderance of the evidence that the information

3    ultimately or inevitably would have been discovered by lawful means . . . then the deterrence

4    rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix*,

5    467 U.S. at 444.  In other words, if "by following routine procedures, the police would inevitably

6    have uncovered the evidence[,]" then the evidence should not be suppressed.  *United States*

7    *v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989).  This exception ensures the police are

8    put "in the same, not a worse, position than they would have been in if no police error or

9    misconduct had occurred."  *Nix*, 467 U.S. at 443.

10          The government urges the court not to exclude the disputed evidence because law

11   enforcement would inevitably have discovered that evidence.  It offers two reasons.  First, the

12   government claims law enforcement "had probable cause to search the residence based on Rucks

13   [sic] prior drug trafficking."  Opp'n at 9.  This argument is unavailing because law enforcement

14   did not seek a search warrant on that basis.  The Ninth Circuit "has never applied the inevitable

15   discovery exception so as to excuse the failure to obtain a search warrant where the police had

16   probable cause but simply did not attempt to obtain a warrant."  *United States v. Mejia*, 69 F.3d

17   309, 320 (9th Cir. 1995).  The inevitable discovery exception does not apply "based on the

18   agents' actual but unexercised opportunity to secure a search warrant."  *United States v. Reilly*,

19   224 F.3d 986, 995 (9th Cir. 2000).  As the Circuit explained in *Mejia*, "apply[ing] the inevitable

20   discovery doctrine whenever the police could have obtained a warrant but chose not to would in

21   effect eliminate the warrant requirement."  69 F.3d at 320.  Here, if the police had information

22   about prior drug trafficking and chose not to include it in the search warrant application, then that

23   information brought forth after the fact does not cure the Fourth Amendment violation.

24          *Mejia* and the present case do differ in one regard: the officers here did obtain a search

25   warrant.  But that is a difference without distinction.  The same motivations justify the rule's

26   application in both cases.  In *Mejia*, the Circuit rejected the government's argument for inevitable

27   discovery because if evidence were admitted despite an "unexcused failure to obtain a warrant,"

28   then the officers have no reason obtain a warrant.  *Id.*  Here, if the police have information, but

                                              16

1  can choose not to include it because the evidence will be admitted anyway, then the officers have

2  no reason to include the information in the warrant application despite its importance.

3  　　　　Second, the government argues the DEA's investigation would have resulted in a search

4  warrant, and as a result, executing that warrant would have inevitably revealed "the evidence at

5  issue here." Opp'n at 9. This argument has several flaws. As noted above, inevitable discovery

6  does not apply when the officers had probable cause but chose not to apply for a search warrant

7  with that information. Here, the police officers had conferred with the DEA after their protective

8  sweep and before submitting their search warrant application, but they chose to include very

9  limited information from the DEA investigation in the probable cause statement authored by

10 Beller. Rather, that probable cause statement states Mr. Rucks "had sold thousands of pills

11 containing fentanyl," based on a series of third-hand communications. Search Warrant Aff. at 17

12 ("Sgt. Burnett advised me a DEA Agent told him . . . ."). Beller chose not to speak with the DEA,

13 nor to include further information from the DEA. In this respect as well, if evidence were

14 admitted under the inevitable discovery doctrine due to available information on controlled

15 substances the officers chose not to disclose, then the police would have no reason to include that

16 information in their search warrant application. *Cf. Mejia*, 69 F.3d at 320. In addition, had the

17 police included the DEA's information in their search warrant application, then that separate

18 investigation might have attenuated the Fourth Amendment violation. *See Strieff*, 579 U.S. at

19 238–41. But they did not. The information not included thus does not excuse the Fourth

20 Amendment violation.

21 　　　　Moreover, for inevitable discovery to apply, the government must show the evidence

22 would have remained in the same location until the subsequent discovery. *See United States*

23 *v. Young*, 573 F.3d 711, 722 (9th Cir. 2009); *United States v. Lundin*, 47 F. Supp. 3d 1003, 1021–

24 22 (N.D. Cal. 2014), *aff'd*, 817 F.3d 1151 (9th Cir. 2016). Here, there has been no such showing.

25 Agent Nehring testified he had planned to get a search warrant and arrest warrant within a "few

26 months." Hr'g Tr. at 69:15. Although Mr. Rucks said he did not plan to move in the next six

27 months, *see id.* at 53:21–25, there is no evidence indicating the ammunition, guns, drugs, or pill

28 press would have remained in his apartment for that time. Mr. Rucks could have chosen to move

1   these items, as they were within his "control and easily movable." *Lundin*, 47 F. Supp. 3d at

2   1021.  Alternatively, if the unlawful protective sweep had not occurred, then following

3   Mr. Rucks's arrest, someone else might have removed the items from the apartment.  *See id.* at

4   1021–22 ("Even had the arrest been legal, the government has not demonstrated that there is no

5   chance other people could have entered the home and moved the guns prior to any later legal

6   search.").  Because the government has not shown the evidence would have remained in the

7   apartment until the DEA obtained and executed a search warrant, the discovery of the evidence

8   was not inevitable.

9                               **2.      Good Faith**

10        When an officer acts in "objectively reasonable reliance on a subsequently invalidated

11  search warrant," the exclusionary rule does not apply.  *Leon*, 468 U.S. at 922.  "The burden of

12  demonstrating good faith rests with the government."  *United States v. Underwood*, 725 F.3d

13  1076, 1085 (9th Cir. 2013) (citation omitted).  Courts recognize several situations in which the

14  good-faith exception does not apply.  *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006)

15  (listing and describing four such situations).

16        In the Ninth Circuit, when an officer conducts an "illegal warrantless search and

17  includ[es] evidence found in this search in an affidavit in support of a warrant," then the

18  magistrate judge's consideration of that evidence "does not sanitize the taint[.]"  *United States v.*

19  *Vasey*, 834 F.2d 782, 789 (9th Cir. 1987).  The good-faith exception is inapplicable because the

20  constitutional error was the officer's, not the magistrate judge's.  *Id.*; *see also Murray*, 487 U.S. at

21  536, 542–43.  In such a case, the evidence "must be suppressed as the fruit of the illegal

22  search[.]"  *United States v. Artis*, 919 F.3d 1123, 1134 (9th Cir. 2019).

23        Here, the government claims the good-faith exception applies because the Butte County

24  officers and DEA agents executing the search warrant relied on a warrant that contained at least a

25  colorable basis for probable cause.  Opp'n at 10.  The government does not cite the applicable

26  caselaw, which the court must consider.  *See Vasey*, 834 F.2d at 789.  Nor does it grapple with

27  whether the search warrant is predicated on illegal evidence, how any taint affects the analysis, or

28  the significance of Butte County officers' executing the search warrant in conjunction with DEA

1  agents.  Instead, the government argues simply the exclusionary rule's deterrent function has little

2  use here because the DEA agents relied in good faith on the search warrant.  Opp'n at 10.

3       The government cannot prevail on this argument.  Beller executed the search warrant, in

4  conjunction with the DEA.  *See* DEA Rep. at 3 ("Det. Beller displayed a copy of the search

5  warrant and requested that agents make entry."); Narrative at 6.  In other words, the lead officer

6  who engaged in the illegal protective sweep and authored the probable cause statement also was

7  involved in executing the search warrant.  The officer's conduct "directly led to the violation of

8  the defendant's constitutional right." *United States v. Odom*, 588 F. Supp. 3d 1032, 1049 (N.D.

9  Cal. 2022).  As a result, the exclusionary rule's deterrent function is at its apex: "to deter

10  wrongful police conduct." *Herring v. United States*, 555 U.S. 135, 137 (2009).

11       In sum, the search warrant application and the warrant itself was based on evidence

12  obtained in violation of the Fourth Amendment.  "The evidence seized pursuant to the [search]

13  warrant must be suppressed as the fruit of the illegal search of [Mr. Rucks's] apartment." *Artis*,

14  919 F.3d at 1134.

15  **V.    CONCLUSION**

16       As explained above, the court assumes Mr. Rucks was arrested outside his residence.  The

17  evidence found during the protective sweep and the execution of the search warrant were

18  collected in violation of his Fourth Amendment rights.  The court **grants the motion to**

19  **suppress**.

20       A **Status Conference is set for November 14, 2022 at 9:00 AM in Courtroom 3**.

21       This order resolves ECF No. 56.

22       IT IS SO ORDERED.

23  DATED:  November 1, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE